# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| HOWARD CONNOR, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> BILL BARRETT CORPORATION, JIM W. MOGG, R. SCOT WOODALL, WILLIAM F. OWENS, EDMUND P. SEGNER, RANDY I. STEIN, and MICHAEL E. WILEY, <br><br> Defendants. | ) <br> ) <br> ) Case No. <br> ) <br> ) **CLASS ACTION COMPLAINT FOR** <br> ) **VIOLATIONS OF SECTIONS 14(a) AND** <br> ) **20(a) OF THE SECURITIES** <br> ) **EXCHANGE ACT OF 1934** <br> ) <br> ) **JURY TRIAL DEMANDED** <br> ) <br> ) <br> ) <br> ) <br> ) |

Howard Connor ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.     This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Bill Barrett Corporation ("BBG" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with BBG, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with

the proposed merger (the "Proposed Merger") between BBG, through its subsidiaries,[1] and Fifth

Creek Energy Operating Company, LLC ( "Fifth Creek").

2.      On December 4, 2017, the Board caused the Company to enter into an agreement

and plan of merger ("Merger Agreement"), pursuant to which (a) Rider Merger Sub,  shall be

merged with and into BBG, with BBG as the surviving entity in such merger (the "BBG merger"),

and (b) Rio Merger Sub shall be merged with and into Fifth Creek, with Fifth Creek as the

surviving entity in such merger (the "Fifth Creek merger"), as a result of which BBG and Fifth

Creek will each become direct wholly owned subsidiaries of Holdco, which will be renamed upon

closing of the mergers (the "Combined Company"). If the mergers are completed, each outstanding

share of BBG common stock will convert into the right to receive one share of Holdco common

stock and all outstanding equity interests in Fifth Creek, in the aggregate, will convert into the

right to receive an aggregate of 100,000,000 shares of Holdco common stock (the "Merger

Consideration").

3.      On December 22, 2017, the Board authorized the filing of a materially incomplete

and misleading preliminary proxy statement/prospectus on Form S-4 (the "Preliminary Proxy")

with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a)

of the Exchange Act.

4.      On January 18, 2018, Plaintiff reached out to Defendants furnishing them with an

earlier draft of this complaint and a letter demanding additional disclosures regarding the Proposed

---

[1]      Red Rider Holdco, Inc., is a Delaware corporation and a wholly owned subsidiary of BBG ("Holdco"), Rio Merger Sub, LLC, is a Delaware limited liability company and a direct wholly owned subsidiary of Holdco ("Rio Merger Sub"), and Rider Merger Sub, Inc., is a Delaware corporation and a direct wholly owned subsidiary of Holdco ("Rider Merger Sub").

Merger (the "Demand Letter").

5.      Shortly thereafter, on January 26, 2018, Defendants filed an amended proxy statement/prospectus on Form S-4/A (the "Proxy") that addressed and mooted some of Plaintiff's claims, but not all. The supplemental disclosures of the Proxy provided: (i) specific values for the Synergies that will result from the consummation of the Proposed Merger; and (ii) information regarding past dealings and the historical relationship between the Company's financial advisor, Tudor Pickering Holt & Co Advisors LP ("TPH"), and BBG—curing a statutory violation of 17 C.F.R. § 229.1015. However, further disclosures are still needed.

6.      The Proxy touts the fairness of the Merger Consideration to the Company's shareholders, but fails to disclose material information that is necessary for shareholders to properly assess the fairness of the Proposed Merger, thereby rendering certain statements in the Proxy incomplete and misleading.  In particular, the Proxy is materially incomplete and misleading concerning: (i) financial projections for BBG and Fifth Creek; and (ii) the valuation analyses performed by TPH in support of its fairness opinion.

7.      The special meeting of BBG shareholders to vote on the Proposed Merger is forthcoming. It is imperative that the material information that has been omitted from the Proxy is disclosed to the Company's shareholders prior to the shareholder vote, so that they can properly exercise their corporate suffrage rights.

8.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9. Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Merger and taking any steps to consummate the Proposed Merger unless and until the material information

discussed below is disclosed to BBG shareholders, or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

9.      Additionally, Plaintiff's Counsel is entitled to a fee in an amount to be determined by the Court or the trier of fact for their actions taken that resulted in the supplemental disclosures of the Proxy.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

11.     Personal jurisdiction exists over each Defendant, either, because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) BBG maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

13.     Plaintiff is, and at all relevant times has been, an BBG shareholder.

14.     Defendant BBG is a Delaware corporation and maintains its headquarters at 1099 18th Street, Suite 2300, Denver, Colorado 80202. BBG is an independent energy company that develops, acquires and explores for oil and natural gas resources. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "BBG."

15.     Individual Defendant Jim W. Mogg is a director of BBG and is the Chairman of the Board.

16.     Individual Defendant R. Scot Woodall is a director of BBG and is the President and Chief Executive Officer of the Company.

17.     Individual Defendant William F. Owens is, and has been at all relevant times, a director of the Company.

18.     Individual Defendant Edmund P. Segner is, and has been at all relevant times, a director of the Company.

19.     Individual Defendant Randy I. Stein is, and has been at all relevant times, a director of the Company.

20.     Individual Defendant Michael E. Wiley is, and has been at all relevant times, a director of the Company.

21.     The parties identified in paragraphs 14 through 20 are collectively referred to as "Defendants".

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of BBG (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

23.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable.  As of December 20, 2017, there were approximately 108,154,843 shares of BBG common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country.  The actual number of public shareholders of BBG will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)     whether Defendants have misrepresented or omitted material information concerning the Proposed Merger in the Proxy in violation of Section 14(a) of the Exchange Act;

ii)     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iii)     whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the

Proposed Merger based on the materially incomplete and misleading Proxy.

c.      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.      A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

## I.      Background and the Proposed Merger

24.      BBG, incorporated on April 29, 2002, is an independent energy company that develops, acquires, and explores for oil and natural gas resources. The Company's assets and operations are located in the Rocky Mountain region of the United States. The Company has two areas of production: The Denver-Julesburg Basin (DJ Basin) and the Uinta Oil Program in the

Uinta Basin.

25.     Fifth Creek is a private exploration and production company, based in Greenwood Village, Colorado, focusing on the development of oil and gas reserves in the Hereford Field area of the DJ Basin, located in rural northern Weld County, Colorado. Fifth Creek operates in one industry segment, which is the development and production of crude oil, natural gas, and natural gas liquid (NGL).

26.     NGP is the controlling owner of Fifth Creek. NGP is a private equity firm in the natural resources industry with approximately $17 billion of cumulative equity commitments organized to make strategic investments in the energy and natural resources sectors.

27.     On December 5, 2017, BBG issued a press release announcing the Proposed Merger. The press release stated in relevant part:

### Bill Barrett Corporation Announces Strategic Combination with Fifth Creek Energy; Significantly Increasing Inventory of Highly Economic XRL Drilling Locations

FALLS DENVER, Dec. 5, 2017 /PRNewswire/ -- Bill Barrett Corporation (the "Company" or "Bill Barrett") (NYSE: BBG) announced today that it has agreed to a strategic business combination with Fifth Creek Energy Company, LLC ("Fifth Creek"), a portfolio company of NGP, in a transaction valued at approximately $649 million. The transaction creates a premier exploitation and production company exclusively focused on oil-weighted rural areas in the Denver-Julesburg ("DJ") Basin. The combined company will possess significant size, scale, and balance sheet flexibility allowing it to economically develop a combined acreage position of approximately 151,100 net acres and an inventory of 2,865 highly-economic future drilling locations, nearly all of which are suitable for extended reach lateral ("XRL") development. The transaction is expected to close late in the first quarter or early in the second quarter of 2018, and is subject to customary conditions, including approval of the Company's stockholders.

**Acquisition Highlights**

• Creates premier DJ Basin focused company with a highly

contiguous and complementary acreage position that is conducive to XRL development
- Pro forma proved reserves of 168 million barrels of oil equivalent (MMBoe) (69% oil) as of December 31, 2016 and pro forma third quarter of 2017 production of approximately 24 MBoe/d (64% oil)
- Acquisition adds approximately 81,000 net acres and approximately 2,900 Boe/d (72% oil) of production located in the Hereford Field area of rural northern Weld County, Colorado
- Hereford Field drilling results are among the highest rate oil wells drilled in the DJ Basin with seven wells averaging 1,052 Boe/d (84% oil) (two-stream basis) during their initial thirty days of production
- Combined company will have substantial scale with approximately 151,100 net acres and a deep inventory of 2,865 undeveloped drilling locations (~95% XRL) that are prospective for multiple Niobrara horizons and the Codell formation, and provide strong weighted average economic returns of 65% at strip pricing
- Maintain operational control as 100% of net acreage at the Hereford Field is operated, largely held by production with minimal near-term lease expirations, and established well control consisting of 62 standard reach lateral ("SRL") delineation wells and seven XRLs
- Established infrastructure on both assets with low operating costs and current oil differentials to WTI of less than $2.50 per barrel
- Initial 2018 plans are to operate three drilling rigs on the combined acreage with anticipated 2018 production of 11-12 MMBoe (~65% oil) and capital expenditures of $500-$600 million
- Solid pro forma financial position highlighted by improving leverage metrics, no near-term debt maturities and ample liquidity to fund development

Chief Executive Officer and President Scot Woodall commented, "We are extremely pleased to announce a strategic combination with Fifth Creek. We have been seeking opportunities to expand our core DJ Basin asset base with the right acquisition to ensure the best value creation opportunity for our stockholders. This presents us with a unique opportunity to add a large, undeveloped acreage position at an attractive cost with the potential for decades of high-return drilling locations located in a rural area that is highly complementary to our legacy position. The transaction creates a compelling long-term growth platform that will allow us to deliver strong company-wide margins as we maximize capital efficiency and concentrate on the highest return project areas. We expect to immediately begin employing our operational expertise on the acquired acreage as we implement enhanced completion and flowback techniques. The acquisition is credit enhancing as it significantly strengthens our balance sheet, and increases our ability

to deliver higher future cash flow and EBITDAX generation. Fifth Creek has built a premier acreage position and with the support of our new partners, we look forward to developing this asset and building value for all stockholders."

Michael R. Starzer, Chief Executive Officer and Chairman of Fifth Creek, stated, "We are excited by the opportunity to partner with Scot and his team to create a premier company that is focused on oil-weighted rural areas of the DJ Basin. We believe the combined company's world class development inventory and exceptional operating talent will result in an excellent outcome for stockholders. At Hereford, Fifth Creek has been on the leading edge of applying modern completion technology to its wells and is proud to have achieved basin-leading results. We are pleased with the opportunity to partner with a company that has successfully managed its business through the downturn, consistently achieving its operating targets and outperforming expectations. I am confident that Scot and his team will do a terrific job of creating value for stockholders."

Scott A. Gieselman, NGP partner, commented, "The combination of Bill Barrett Corporation and Fifth Creek Energy creates a premier oil focused and rural DJ Basin company with unparalleled growth potential at strong returns. We are proud of our new partnership with the Bill Barrett team given their excellent track record and look forward to participating in the growth of the combined entity."

**Transaction Details**

Under the terms of the transaction, Bill Barrett and Fifth Creek will each become subsidiaries of a newly formed holding company ("New BBG"), which will become the publicly listed and traded holding company for the combined Bill Barrett and Fifth Creek. In the transaction, Bill Barrett's stockholders will exchange their Bill Barrett common stock for New BBG common stock on a 1-for-1 basis, and Fifth Creek's current sole owner will receive 100 million shares of the New BBG's common stock. Based on the Company's closing stock price as of December 4, 2017, the consideration being delivered to Fifth Creek's owner implies a total transaction value of approximately $649 million on an enterprise value basis, which includes the shares plus the assumption of up to $54 million of debt.

Concurrent with the transaction, the Company also announced that it has agreed to a privately negotiated exchange with a holder of the Company's 7.0% Senior Notes due 2022 (the "Notes"), in which the holder has agreed to exchange $50 millionaggregate principal amount of the Notes for newly issued shares of the Company's common stock plus the cash payment of accrued and unpaid interest. The number of shares exchanged will be calculated based on the volume-weighted average price of trading on December 6, 2017 and the value of the bonds will be at 102% of par.

Holders of the Senior Notes that hold a majority of the outstanding aggregate principal amount of each series of Senior Notes have

agreed to deliver consents pursuant to which the proposed transaction with Fifth Creek will not be considered a change of control for purposes of the Company's Senior Notes.

The Board of Directors of both companies have unanimously approved the terms of the agreement. The completion of the transaction is subject to approval of the Bill Barrett stockholders, any regulatory approvals and customary conditions. The transaction is expected to close late in the first quarter or early in the second quarter of 2018.

## Pro Forma Position

The combined company will create a leading DJ Basin pure play company with an exclusively rural acreage position and significant weighting to oil and natural gas liquids. The combined company will possess two core and highly contiguous acreage positions with approximately 151,100 net acres located in the Hereford Field and Northeast ("NE") Wattenberg areas and a deep inventory of approximately 2,865 gross undeveloped locations (~95% XRL) that are prospective for multiple Niobrara benches and the Codell formation and confirmed with extensive seismic and petrophysical analysis and modelling. Assuming current strip pricing, these locations are expected to provide an attractive weighted average rate of return of approximately 65%. Average daily production for the combined assets was approximately 24 MBoe/d (81% liquids, 64% oil) in the third quarter of 2017 with combined proved reserves of 168 MMBoe (69% oil) as of December 31, 2016.

The combined company will greatly benefit from increased economies of scale and a low operating cost structure. The largely undeveloped nature of Fifth Creek's acreage position allows for the application of modern completion designs to enhance well returns. The Hereford Field has established well control as a result of 62 SRL delineation wells, including the historic "Jake well" that is credited with starting the horizontal Niobrara drilling boom in the DJ Basin. During 2017, seven wells were completed in the Hereford Field with modern completion designs and had an average initial thirty-day production rate of 1,052 Boe/d (84% oil), which are among the highest rate oil wells ever drilled in the DJ Basin. It is also anticipated that three drilling rigs will operate on the combined acreage position in 2018. The combined acreage has existing infrastructure in place to support planned development and benefits from having no firm oil marketing or pipeline commitments, resulting in current oil price differentials to West Texas Intermediate pricing of less than $2.50 per barrel. Approximately 150 gross wells will spud in 2018 with anticipated 2018 production of 11-12 MMBoe (~65% oil) and $500-$600 million of associated capital expenditures. This preliminary plan assumes full-year 2018 outlooks for each company and formal 2018 guidance is anticipated to be issued following the closing of the transaction.

The combined company will be well capitalized with a solid financial position and balance sheet flexibility with no debt maturities until 2022. Balance sheet strength is highlighted by a significant cash position, an undrawn credit facility, improving leverage metrics, and strong liquidity to fund the planned high-return development program.

### Leadership and Corporate Governance

Scot Woodall will continue to serve as Chief Executive Officer and President of the combined company. The Board of Directors of the combined company will be comprised of eleven members, including the six members of Bill Barrett's current Board of Directors and five members that will be designated by Fifth Creek. Jim W. Mogg will continue to serve as Chairman of the Board.

### Advisors

Tudor, Pickering, Holt & Co. acted as financial advisor to Bill Barrett and Wachtell, Lipton, Rosen & Katz acted as legal advisor to Bill Barrett.

Credit Suisse acted as financial advisor to Fifth Creek and Vinson & Elkins LLP acted as legal advisor to Fifth Creek.

## II.    The Merger Consideration Fails to Fairly Compensate BBG Shareholders

28.    The Merger Consideration is unfair to shareholders given BBG's recent financial performance and strong growth prospects.

29.    On August 1, 2017, the Company announced positive financial results for the 2017 second quarter. Production sales volumes of 1.53 MMBoe for the second quarter were at the high end of guidance range of 1.45-1.55 MMBoe. Capital expenditures of $59 million in the second quarter were below guidance range of $65-$75 million. Lease operating expense ("LOE") averaged $3.61 per Boe, representing 32% improvement from the second quarter of 2016. Scot Woodall commented:

We executed on our operational plan and posted very good results that translated into an across the board beat compared to sell-side consensus estimates. This was primarily achieved by higher

> production, higher oil price realizations, due to an improvement in differentials, and lower per unit LOE. We are seeing encouraging early results from DSUs that utilized higher sand concentration and tighter frac stage spacing. Our operations team continues to demonstrate drilling efficiencies as average drilling days for XRL wells in 2017 are approximately 18% lower compared to the average of 2016. Our pace of development is increasing with the previously announced addition of a second drilling rig in the DJ Basin. We also saw positive early performance from recompletions in the Uinta Oil Program during the quarter. We maintain operational control and flexibility with respect to our capital program, including the ability to adjust spending as warranted based on changes to the commodity price environment. Our liquidity consists of a cash position in excess of $150 million and an undrawn credit facility that is supported by our underlying hedge position. We also have no near-term debt maturities. As demonstrated by previous actions, we will be capital disciplined and financially responsible as we navigate the current commodity price environment..

30.     BBG's good news continued on October 31, 2017, when the Company announced positive financial results for the 2017 third quarter. Production sales volumes of 1.92 million barrels of oil equivalent ("MMBoe") for the third quarter of 2017, which increased 26% sequentially from the second quarter of 2017. Oil production sales volumes of 1.2 million barrels of oil ("MMBbls") for the third quarter, which increased 33% sequentially and represents 63% of total production volumes. LOE of $3.08 per Boe decreased 15% sequentially, and DJ Basin LOE of $2.52 per Boe decreased 18% sequentially. Drilling and completion cycle times for the extended reach lateral ("XRL") program improved 28% compared to 2016 led by efficiency gains. 2017 production guidance increased to 6.9-7.1 MMBoe, representing 21% growth over 2016 at the mid-point. Scot Woodall stated:

> We delivered another outstanding quarter of results that was highlighted by 26% sequential production growth, 33% sequential growth in oil volumes, tighter oil differentials, an 18% sequential decrease in LOE, and capital spending that was below guidance. As these results demonstrate, our execution is strong with early positive

results from our enhanced completion program meeting or exceeding our base XRL type-curve. Current planned activity underpins a further increase in our production outlook and a corresponding decrease in LOE as outlined by our updated guidance. We now anticipate 2017 production growing over 20% relative to 2016 and expect to generate greater than 30% growth in 2018. This builds significant momentum as we head into 2018 with higher associated cash flow and EBITDAX generation. We recently initiated a marketed sales process to divest of our Uinta Oil Program assets and, if successful, anticipate a sale announcement prior to year-end. Proceeds will increase liquidity and help fund expected activity in 2018. We are in a good financial position with current liquidity consisting of a cash position in excess of $150 million and an undrawn credit facility that is supported by an underlying hedge position.

31.     Indeed, in the six months leading up to the Merger Agreement, BBG's stock price increased 70%, going from $3.51 on June 1, 2016 to $5.98 on December 1, 2017, illustrated by the chart below:



32.     However, as soon as the deal was announced, the price dropped immediately and severely, going from just over $6 per share to just over $4.50 per share, losing roughly 25% of its value in 24 hours.

33.     Prior to the announcement of the Proposed Merger, on November 2, 2017, financial analysts at Imperial Capital marked BBG as "Outperform" with an $8 price target. However, directly after the announcement of the Proposed Merger, on December 7, 2017, those same analysts downgraded BBG's outlook and cut their price target down to $5 per share.

34.     In sum, the Merger Consideration appears to inadequately compensate BBG shareholders for their shares.  Given the Company's strong financial results and growth potential, it appears that the Merger Consideration is not fair compensation for BBG shareholders. It is therefore imperative that the Company's shareholders receive the material information (discussed in detail below) that Defendants have omitted from the Proxy, which is necessary for shareholders to properly exercise their corporate suffrage rights and make an informed decision concerning whether to vote in favor of the Proposed Merger.

## III.     The Merger Agreement's Deal Protection Provisions Deter Superior Offers

35.     In addition to failing to conduct a fair and reasonable sales process, the Individual Defendants agreed to certain deal protection provisions in the Merger Agreement that operate conjunctively to deter other suitors from submitting a superior offer for BBG.

36.     First, the Merger Agreement contains a no solicitation provision that prohibits the Company or the Individual Defendants from taking any affirmative action to obtain a better deal for BBG shareholders. The Merger Agreement states that the Company and the Individual Defendants shall not, directly or indirectly:

(i) solicit, initiate, knowingly facilitate or encourage any inquiry, proposal or offer from any person relating to, or that could reasonably be expected to lead to, an alternative proposal, (ii) engage or participate in any discussions or negotiations with, or provide any non-public information or access to the business, properties, assets, books or records of BBG, or cooperate with, assist or facilitate any efforts by any person relating to, or that could reasonably be expected to lead to, an alternative proposal, (iii) accept any proposal or offer relating to an alternative proposal, (iv) approve, adopt, or enter into or recommend any contract, letter of intent or similar agreement relating to an alternative proposal or (v) resolve, agree or publicly propose to take any of the actions referred to in clauses (i)–(iv).

37.     Additionally, the Merger Agreement grants Fifth Creek recurring and unlimited matching rights, which provides Fifth Creek with: (i) unfettered access to confidential, non-public information about competing proposals from third parties which it can use to prepare a matching bid; and (ii) five business days to negotiate with BBG, amend the terms of the Merger Agreement, and make a counter-offer in the event a superior offer is received.

38.     The non-solicitation and matching rights provisions essentially ensure that a superior bidder will not emerge, as any potential suitor will undoubtedly be deterred from expending the time, cost, and effort of making a superior proposal while knowing that Fifth Creek can easily foreclose a competing bid.  As a result, these provisions unreasonably favor Fifth Creek, to the detriment of BBG's public shareholders.

39.     Lastly, the Merger Agreement provides that BBG must pay Fifth Creek a termination fee of $22,500,000 in the event the Company elects to terminate the Merger Agreement to pursue a superior proposal.  The termination fee provision further ensures that no competing offer will emerge, as any competing bidder would have to pay a naked premium for the right to provide BBG shareholders with a superior offer.

40.     Ultimately, these preclusive deal protection provisions restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.

41.     Given that the preclusive deal protection provisions in the Merger Agreement impede a superior bidder from emerging, it is imperative that BBG's shareholders receive all material information necessary for them to cast a fully informed vote at the shareholder meeting concerning the Proposed Merger.

## IV.     The Proxy Is Materially Incomplete and Misleading

42.     On January 26, 2018 Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Merger. The Individual Defendants were obligated to carefully review the Proxy to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents and/or omits material information, in violation of Sections 14(a) and 20(a) of the Exchange Act, that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Merger.

43.     First, BBG management fails to provide complete and accurate projections, so that shareholders can obtain a true sense of its present and future value of BBG, Fifth Creek, and the Combined Company. In TPH's *Discounted Cash Flow Analyses* section, the Proxy states that TPH specifically utilizes the unlevered free cash flow projections[2] provided by the Company's

---

[2]     Unlevered free cash flows are used to determine a company's enterprise value. The unlevered free cash flow allows investors to ascertain the operating value of a company independent of its capital structure. This provides a greater degree of analytical flexibility and allows for a clearer picture of the value of the company overall. For this reason, unlevered free cash flows are routinely used to value a company, especially in merger contexts.

management for both BBG and Fifth Creek.

44. Complete and accurate unlevered free cash flow projections are material to the Company's shareholders. Indeed, investors are concerned, perhaps above all else, with the unlevered free cash flows of the companies in which they invest. Under sound corporate finance theory, the value of stock should be premised on the expected unlevered free cash flows of the corporation. Accordingly, the question that the Company's shareholders need to assess in determining whether to vote in favor of the Proposed Merger is clear – is the Merger Consideration fair compensation given the companies' unlevered free cash flows? Without complete and accurate unlevered free cash flow projections, the Company's shareholders will not be able to answer this question and assess the fairness of the Merger Consideration.

45. With respect to the TPH's *Selected Transactions Analysis*, the Proxy fails to disclose the individual metrics TPH calculated for each transaction utilized. The omission of these individual metrics renders the summary of this analysis and the accompanying valuation ragnge materially misleading. A fair summary of Transactions analyses requires the disclosure of the individual metrics for each transaction; merely providing the range and a median is insufficient, as shareholders are unable to assess whether the banker applied appropriate metrics, or, instead, applied unreasonably low metrics in order to drive down the implied share price ranges.

46. With respect to TPH's *Discounted Cash Flow Analysis*, the Proxy fails to disclose the following key components used in their analysis: (i) the inputs and assumptions underlying the calculation of the discount rate range of 8.0% to 12.0%; (ii) the inputs and assumptions underlying the determination of the EBITAX multiple range of 3.5x to 6.5x; (iii) the actual range of terminal values calculated and utilized in the Analysis; and (iv) the individual metrics of the selected

comparable companies underlying many of the assumptions.

47. These key inputs are material to BBG shareholders, and their omission renders the summary of TPH's *Discounted Cash Flow Analyses* incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions – in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id*. As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion *unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices*. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78.

48. With respect to TPH's *Equity Contribution Analysis*, the Proxy fails to disclose the individual multiples calculated for the selected comparable companies and used to compare against BBG's Implied Equity Contribution. Similar to the *Selected Transactions Analysis*, the disclosure of the individual multiples is important so that shareholders may assess whether the banker applied

appropriate multiples, or, instead, applied unreasonably low multiples in order to drive down BBG's Implied Equity Contribution. The failure to disclose the individual multiples renders the analysis materially incomplete and misleading.

49.     With respect to TPH's *Net Asset Value Accretion/Dilution Analysis*, the Proxy fails to disclose the amount each case—including and excluding the effects of the proposed equity financing transaction—would accrete. In performing the calculations to determine whether the deal would be accretive or dilutive, TPH certainly calculated quantifiable amount that each case would accrete. By omitting these respective accretive values, the Proxy prohibits shareholders from determining the dilutive effect of the proposed equity financing transaction. Given $100 million size of the proposed equity financing transaction, its dilutive effect, and the degree of its dilutive effect, would undoubtedly be material information to shareholders. Therefore, omitting such values renders the summary of the analysis materially incomplete and misleading.

50.     In sum, the omission of the above-referenced information renders statements in the Proxy materially incomplete and misleading in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Merger, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

51.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

52.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

53.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

54.     The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

55.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Merger.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for BBG and Fifth Creek; and (ii) the valuation analyses performed by TPH in support of its fairness opinion.

56.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed

to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

57. The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger; indeed, the Proxy states that TPH reviewed and discussed its financial analyses with the Board, and further states that the Board considered both the financial analyses provided by TPH as well as its fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company.

58. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to review TPH's analyses in connection with their receipt of the fairness opinion, question TPH as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

59. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing

materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

60.     BBG is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

61.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Merger.

62.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

63.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

64.     The Individual Defendants acted as controlling persons of BBG within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of BBG, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with

the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

65.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

66.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger.  They were thus directly involved in preparing this document.

67.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

68.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

69.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by

their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

70.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT III

**(Equitable Assessment of Attorneys' Fees and Expenses Against All Defendants)**

71.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

72.     Plaintiff raised meritorious claims in his Demand Letter.

73.     As a result of and in order to address Plaintiff's Demand Letter, the Company made material supplemental disclosures on January 26, 2018 in the Proxy.  Therefore, Plaintiff assisted in and conferred a benefit on the Company's shareholders by requiring Defendants to provide the additional disclosures contained in the Proxy.

74.     To date, Plaintiff's Counsel has not received any fees for the benefit provided to BBG's shareholders.

75.     Accordingly, Plaintiff's Counsel is entitled to a fee in an amount to be determined by the Court or the trier of fact.

76.     Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.      Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Merger or consummating the Proposed Merger, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.      Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: February 8, 2018                                     Respectfully submitted,

                                                            **MONTEVERDE & ASSOCIATES PC**

                                                            /s/ *Juan E. Monteverde*
                                                            Juan E. Monteverde
                                                            The Empire State Building
                                                            350 Fifth Avenue, Suite 4405
                                                            New York, NY 10118
                                                            Tel: (212) 971-1341
                                                            Fax: (212) 202-7880
                                                            Email: jmonteverde@monteverdelaw.com
                                                            *Attorneys for Plaintiff*